The PRUDENTIAL INSURANCE COMPANY OF AMERICA et al., Appellants,

v.

Dolline BEATY, as Community Survivor of the Estate of Willis Beaty, Deceased, Appellee.

No. 7989.

Court of Civil Appeals of Texas, Texarkana.

June 2, 1970.

Dale Edwards, Atchley, Russell, Hutchinson & Waldrop, Texarkana, for appellants.

James Tony Hileman, Jefferson, for appellee.

FANNING, Justice.

Appellee sued appellants to recover benefits under a certificate of credit life insurance issued by Prudential Insurance Company to Willis Beaty, deceased, in connection with the purchase by appellee and her husband, Mr. Beaty, of a new automobile in January, 1967. Appellants denied liability on the basis of an alleged misrepresentation by Mr. Beaty as to his "good health" when completing the application for the insurance. Mr. Beaty died very shortly after the execution of the application and Mrs. Beaty, as community survivor, brought the suit to collect on the insurance benefits.

Trial was to the court with the aid of a jury. At the close of the testimony appellants moved for an instructed verdict on the basis that as a matter of law all of the essential elements of the misrepresentation defense had been established through stipulations by counsel and the uncontroverted testimony. The motion was overruled.

The jury, in response to special issue No. 1, found to the effect that the representation made by Willis Beaty on or about January 21st, 1967, that he was in "Good Health" was false. The definition given in connection with issue 1, was as follows:

"You are instructed that by the term 'Good Health' as used here, is meant 'A state of health free from any disease or bodily infirmity of a substantial nature which affects the general soundness and healthfulness of the system seriously, or materially increased the risk to be assumed by the insured.'"

The jury in response to conditionally submitted issue 2 found to the effect that Willis Beaty did not know that he was not in "Good Health", (as that term has been defined) on or about January 21st, 1967.

Conditionally submitted issues 3 and 4 inquiring as to whether the representation of Beaty that he was in "Good Health" on or about January 21, 1967, was made for the purpose of inducing Prudential Life Insurance Company to issue the policy of life insurance in question, and whether Prudential relied upon Beaty's said representation of "Good Health" on or about the 21st day of January, 1967, were not answered by the jury.

Both parties stipulated that the "Good Health" representation of Beaty above referred to was "material to the risk".

Appellant's motion for judgment N.O.V., and to disregard the finding to issue 2 was overruled and judgment was entered for plaintiff-appellee for the amount of the

policy and for an attorney's fee and costs. Appellants' motion for new trial was overruled. Appellants have appealed.

Appellants on appeal, among other things, contend to the effect that they are entitled to judgment as a matter of law, in that the jury's finding to special issue 1, and the uncontroverted facts established that Mr. Beaty was not in "good health" on or about January 21, 1967, that he knew, and was charged with knowledge, as a matter of law, under the uncontroverted facts in this case, that he was not in "good health", at the time he applied for the certificate of insurance and that all other elements of the defense of misrepresentation by the insured were conclusively established as a matter of law by jury findings, stipulations and the uncontroverted evidence. We sustain appellants' above contentions and reverse and render as hereinafter stated.

Prudential issued a credit-life insurance certificate to Willis Beaty, deceased, the husband of appellee, in connection with the purchase by Mr. Beaty and appellee of a new 1967 automobile from Nehls Chevrolet in Marshall, Texas, on or about January 21, 1967. This type certificate of credit-life insurance required the insurer to pay the balance due on the new car if the insured died before paying for the automobile. Appellee took the sales contract and application for credit-life insurance to East Texas Tuberculosis Hospital in Tyler, Texas, where the deceased-insured had been hospitalized since November 6, 1966. Mr. Beaty, from his hospital bed, after reading the application and other papers, signed the application for insurance, which application for insurance contained the following "good health" representation:

"I, the purchaser proposed for life insurance in order to induce Prudential to effect such insurance, do hereby declare to the best of my knowledge and belief I am now in good health."

Two days later, on Jan. 23, 1967, the application and conditional sales contract were returned by appellee to Nehls Chevrolet where said papers were signed by Mr. Brown, agent of Nehls Chevrolet. On January 23, 1967, Mr. Willis Beaty was transferred from East Texas Tuberculosis Hospital to Parkland Hospital in Dallas, Texas, with appellee accompanying her husband to Parkland Hospital after leaving the insurance application and conditional sales contract at Nehls Chevrolet. Three weeks later, on February 14, 1967, Mr. Beaty died in Parkland Hospital, with the immediate cause of death being "constrictive pericarditis" due to tuberculosis. Mr. Beaty has not worked since 1963, and had a long history of tuberculosis and pericarditis, the first positive diagnosis of tuberculosis having been made in 1964.

Prudential, after Mr. Beaty's death, and his long history of illness together with the seriousness of his illness when Mr. Beaty executed the application containing the "good health" representation, denied liability and tender and restoration was given the insured for the amount of the premium.

The conditional sales contract on the automobile in question showed a trade-in down payment of $250.00, with an item of $29.29 for credit insurance charged, along with other items, and the total of the time deferred balance to be paid on the car was $2,753.92, and was payable in 36 monthly installments of $76.22, with the first installment being due on March 5, 1967. Mr. Beaty died on February 14, 1967, which was prior to March 5, 1967, the due date of the first payment, and such date of death was about 3 weeks after January 21, 1967, when he signed the application for insurance containing the "good health" representation.

The focal point on this appeal is whether under the undisputed facts Willis Beaty knew and was charged with knowledge that he was not in "good health" when he signed the insurance application. All of the other elements of the misrepresentation defense were unquestionably established by the undisputed facts.

There was no controversy that Mr. Beaty made the "good health" representation. The application with the "good health" declaration was shown to have been executed by Mr. Beaty and the same was introduced in evidence. The jury found that the "good health" representation was false, and such finding was supported by the undisputed evidence, as hereinafter discussed. We think the undisputed evidence shows (that contrary to the jury's finding) that Mr. Beaty knew and was charged with knowledge that such "good health" representation was false, as hereinafter more fully discussed.

■ The application itself expressly stated that the purpose of the representation of "good health" was to induce Prudential to issue the policy in question. Since the application itself expressly stated that the purpose of the representation was to induce issuance of the policy there was no need to submit and secure a finding as to the purpose of the representation, it having already been conclusively established. In this connection see Inter-Ocean Ins. Co. v. Ross, Tex.Civ.App.1958, 315 S. W.2d 71, no writ, and Maniatis v. Texas Mut. Life Ins. Co., Tex.Civ.App.1936, 90 S.W.2d 936, no writ. The submission of issue 3 was unnecessary, and the failure of the jury to answer said conditionally submitted issue is immaterial since the matter inquired about in issue 3 was established as a matter of law under the undisputed evidence.

■ Likewise the failure of the jury to answer conditionally submitted issue No. 4 was immaterial, since the matter inquired about was established as a matter of law under the undisputed evidence. The fact of "reliance" upon the "good health" representation was established without dispute. In this connection see General American Life Ins. Co. v. Martinez, Tex.Civ.App. 1941, 149 S.W.2d 637.

And as above stated, it was expressly stipulated by both parties that the "good health" representation was material.

■ The issue as to whether an insured "knew" that he was not in good health, normally and under less extreme facts than in the case at bar, is generally for the trier of the facts to decide. In this connection, see Great Southern Life Insurance Co. v. Doyle, Tex.Comm.App.1941, 136 Tex. 377, 151 S.W.2d 197, and Clark v. National Life & Accident Ins. Co. (1947), 145 Tex. 575, 200 S.W.2d 820. However, we think that Mr. Beaty's statements were not ignorantly made, nor were they simply innocent misstatements of facts as in *Doyle, Clark,* and other cases of like import.

Of course where an applicant for life insurance is suffering from some latent malady he may well be unaware of the same and in such cases and others where there is reason to believe that the applicant for insurance may have been unaware that he was not in "good health", the question of his "knowledge" is a matter to be determined by the trier of the facts.

■ However, there are some cases, and we think this is one, where the circumstances render a conclusion that the applicant did not know that he was not in "good health" patently unreasonable and unbelievable. The factors in these cases include: the nature of the disease; the duration of the disease prior to the making of the "good health" representation; the nature and frequency of medical treatment just prior to making the representation; the outward manifestations or symptoms of the disease or ailment, if any, at the time of the application for insurance; material conversations by the applicant with his doctor; the brevity of time between the representation and death or disability from the disease or ailment; hospitalizations shortly before the representation; and previous hospitalizations, previous attacks of or treatments of the disease, infirmity or ailment. In this connection see 7 Couch on Insurance, 33:106, (1961).

In extreme cases, such as the one which we have before us, Texas courts also have concluded as a matter of law, that the per-

son making a patently and obviously false "good health" representation "knew" that such person was not in good health. In this connection see American National Insurance Company v. Anderson, Tex.Civ. App., 179 S.W. 66, (1915), no writ, where the insured had, as here, been under treatment for tuberculosis prior to applying for the policy in question, but stated he was in "good health" and where the court stated in part as follows:

"Now we come back to the facts of this case. Leon Anderson made written application to the appellant for a policy of life insurance on December 11, 1913. Less than three weeks before that date he had consulted a physician, and had been examined and told that he had a very bad lung. Less than two weeks before that date he again consulted the same physician, and was told that he had tuberculosis; yet in his application for insurance he stated that he was in good health, and that he never had had consumption. It is too clear for argument that it was the condition of his health that caused him to consult the physician, and when, added to this fact, he was told that he had a very bad lung, and that he was afflicted with tuberculosis, *it is inconceivable that he believed that his health was good when he stated it to be so in the application*. But appellee argues, in effect, that the doctor did not explain to him what tuberculosis was, and that, although he had been told that he had tuberculosis, it did not follow that he knew he had consumption, and that answering as he did that he did not have consumption is no evidence that he answered in bad faith or with intent to deceive. We cannot believe that at this time, when the fight against the dread malady is world-wide, when campaigns of education have been conducted everywhere to instruct people as to danger of contracting it and the best methods for *its avoidance, that an average 16 year old school boy*, such as the insured was

shown to be, when he was told by the physician he consulted that he had a very bad lung, and that he had tuberculosis, did not know that he was suffering from consumption. *He at least knew that he was not in good health when he represented that he was*. His statements in the regard mentioned were relied upon by the insurance company, and but for the misrepresentations the policy would not have been issued. 'The matter or thing misrepresented was material to the risk or actually contributed to the contingency or event on which paid policy became due and payable.'

"We think, therefore, that the judgment in favor of the plaintiff was erroneous and should be set aside, and that judgment should be here rendered for the appellant; and it has been so ordered." (Emphasis added

The Texas Supreme Court in Allen v. American National Ins. Co., Tex.Sup.1964, 380 S.W.2d 604, stated in part as follows:

"A court might properly conclude from certain facts that, inferences of the *knowledge* of disease or bodily condition *must be drawn as a matter of law*. The phrase 'should have known' may suggest this concept. However, such words are not suitable for this purpose as the usual connotation of the phrase 'should have known' has to do with negligence and would be so understood by a jury. * * *" (Emphasis added.)

The case of Prudential Ins. Co. of America v. Levinson, Tex.Civ.App.1969, 444 S.W.2d 811, wr. ref., n. r. e., is one of the latest cases rejecting a jury finding that an insured *did not know* the falsity of health representations in an application for life insurance where the facts so warranted. The jury in this case found that the insured did not know the representations were false, and that such were not made for the purpose of inducing the issuance of the policy in question. The Beaumont Court of Civil Appeals, in this case, re-

versed and rendered in favor of the insurer, stating in part as follows:

"Both Mr. Levinson and his wife knew she had a serious situation with high blood pressure. Levinson knew the falsity of his answers on the application, which is binding on Mr. Levinson. There can be no conclusion except that the false answers were for the purpose of inducing the insurance company to issue the policy. The false statements on the application were material to the risk, and relied upon by Prudential.

"The evidence only favorable to the findings of the jury in answer to Special Issues Nos. 7 and 8 is considered in passing upon the no-evidence points. Prudential's no evidence points with reference thereto are sustained. Allen v. American National Insurance Company, 380 S.W.2d 604 (Tex.Sup.1964), which cites and approves the holding in Texas Industrial Trust v. Lusk, [Tex.Civ.App., 312 S.W.2d 324] supra.

"So holding, the other points of error of defendant are immaterial and are not considered.

"Judgment of the trial court is reversed and judgment rendered for Prudential Insurance Company of America, cancelling the insurance policy issued to Sidney L. Levinson with Mrs. Levinson as an insured, with Mr. Levinson recovering the premiums tendered into the trial court. All costs are adjudged against Sidney L. Levinson."

In Croll v. John Hancock Mutual Life Ins. Co., 3 Cir., 198 F.2d 562 (1952), it was stated in part as follows:

"Appellant stresses the fact that the decedent may not have known of his heart condition. The most uneducated and unsuspecting person, however, is as keenly aware as anyone of pains in his chest, shortness of breath, and stomach and intestinal distress."

We think an examination of the medical history of Mr. Beaty, together with the testimony of his treating physician at the time he executed the application for insurance, as well as the other facts in the case, compel the conclusion that Mr. Beaty "knew" that he was not in "good health" at the time he signed the application.

Some of the pertinent facts are as follows: Mr. Beaty left his last job in 1963, and never had another one; shortly thereafter Mr. Beaty first realized he was sick; in Jan. or Feb. of 1964 he had a chest x-ray in Jefferson and was sent to Scheumpert Hospital in Shreveport where a "pericardial" (the sac around the heart) effusion was made and 300 cc's of yellow cloudy fluid was obtained; on March 4, 1964, he was transferred directly to East Texas Tuberculosis Hospital in Tyler, Texas, for treatment of tuberculosis and at said time he had a six weeks history of fever, malaise and dyspnea and pericardial effusion; at East Texas Tuberculosis Hospital he was treated for "pericardial tuberculosis" (of the heart sac) with extensive effusion, and he was there started on the antituberculosis treatment and drugs; on May 20, 1964, Mr. Beaty was transferred to Parkland Hospital in Dallas, with admission diagnosis being "plural effusion, severe T.B. constrictive pericarditis"; on June 1, 1964, at Parkland, an anterior "pericardectomy" or removal of the heart sac, was performed on Mr. Beaty; on June 20, 1964, he was returned to East Texas Tuberculosis Hospital, where he underwent antituberculosis treatment and thereapy until July 6, 1965, when he was released as the tuberculosis was then considered to be in an inactive state; however he was cautioned in his discharge letter as to "the great importance of taking care of yourself" and he was to continue taking I.N.H., an antituberculosis medication; shortly after his heart surgery in Parkland, Mr. Beaty applied for social security disability benefits, and he shortly thereafter began receiving $82.00 per month disability benefits, which continued until his death—his age at time of death (lacking a short time) was 59; on March 7, 1966, Mr. Beaty was readmitted to East Texas Tuberculosis

Hospital with "shortness of breath" and a positive sputum of T.B. was then found. After treatment he was released on March 30, 1966, with orders to continue to take his T.B. drugs and from there Mr. Beaty was taken to Parkland in Dallas where a cardiac series was performed, with Mr. Beaty spending April and most of May, 1966, in Parkland; the cardiac series performed April 25, 1966, at Parkland revealed "right sided cardiac enlargment" and there Mr. Beaty continued to complain of "shortness of breath and D.O.E." ; Dr. McNally of Parkland saw Mr. Beaty on May 13, 1966, and at this time Dr. McNally heard the murmur of tricuspid insufficiency "and recommended repeat cardiac catherization", and Mr. Beaty was discharged again from Parkland the latter part of May, 1966; on Nov. 9, 1966, Mr. Beaty was again admitted to East Texas Tuberculosis Hospital for the fourth and final time, with his admission symptoms being "increased shortness of breath, ankle edema, frontal chest pain and hoarseness", and according to Dr. Ahn who treated Mr. Beaty on his fourth admission to the T.B. hospital, his "main problem was congestive heart failure", and the admission diagnosis was "congestive heart failure with cardiomegaly" or enlargement of the heart along with post-pericardiectomy due to tuberculosis of the pericardium or sac around the heart; Dr. Ahn characterized Mr. Beaty's condition on admission in part as follows:

"At that time he was quite sick, he was quite sick. Congestive heart failure in particular this case, was quite ominous and prognosis was guarded * * * Dangerous."

At first Mr. Beaty's condition began to improve with treatment, but in early or mid-December of 1966, slightly over one month before Mr. Beaty signed the insurance application, his condition began to badly deteriorate, as he then developed "shortened breath and distention of the abdomen", with "increasing of abdominal distention" and increasing swelling of his ankles and his liver was enlarged and "his congestive heart failure was getting worse"; shortly around mid-December of 1966, Dr. Ahn talked with Dr. Webb of Parkland about transferring Mr. Beaty to Parkland, and on January 16, 1967, Dr. Ahn received notice from Parkland that they then had room to accept Mr. Beaty; the policy of the East Texas T.B. Hospital was to secure consent of the patient and his family prior to transferring a patient, and Mr. Beaty was aware of his impending transfer to Parkland on January 21, 1967, the date he signed the insurance application stating he was in "good health".

More pertinent facts on and near the time Mr. Beaty signed the insurance application are as follows: On January 18, 1967, three days before Mr. Beaty signed the insurance application, "fluid" was discovered in his abdominal cavity, due to congestive heart failure; this fluid was removed from Mr. Beaty's abdomen and he saw it and during this time, according to Dr. Ahn:

"he (Mr. Beaty) had a constant complaining because he was a real sick man, the distention, well the distention of gas * * * uncomfortable abdomen, stomach."

On January 21, 1967, the day that Mr. Beaty signed the insurance application, Dr. Ahn characterized Mr. Beaty's condition (in part) as follows:

"His congestive heart failure getting worse * * * the old situation getting slowly worse, very slowly, but gradually worse. * * * In general over all * * * generally speaking, it (his state of health) was bad.

"He looked—he was sick. Even laymen, not only doctors, even laymen knew that he was a sick man. * * * On the face even everybody knew—even a small baby knows that he is frankly sick, frankly sick—I mean overtly * * *. His stomach distended, and shortness of

breath and swelling of ankles, this everybody can see."

On January 23, 1967, the date appellee returned the credit life insurance application to Nehls Chevrolet, Mr. Beaty was transferred to Parkland with his condition steadily deteriorating; the admission sheet at Parkland stated:

"Patient has severe congestive heart failure and R.V.H., R.A.H. He had pericardiectomy in 1964 because of T.B. of the pericarditis. Now has murmur that could be T.B. Would like suggestions for definition and therapy."

At Parkland Mr. Beaty received extensive treatment to reverse his steadily deteriorating condition as evidenced by the mass of medical records introduced in evidence, however these efforts were unsuccessful and Mr. Beaty died at Parkland on February 14, 1967, about three weeks after executing the "good health" representation; appellee signed the death certificate as informant, and the certificate stated to the effect that the immediate cause of death was "constrictive pericarditis" due to tuberculosis, and the death certificate placed the interval between the onset of the specific cause of death and the death itself as "six months," and the interval between the onset of the general illness and death was said to be "unknown".

Among other factors relative to the knowledge of Mr. Beaty that he was not in "good health" at the time he signed the insurance application are the following: That although he was a very sick man in the hospital he was mentally alert and read the papers, and there is no intimation whatever that he was in any way other than mentally competent at the time he signed the application; likewise from Dr. Ahn's testimony as to his complaints and outward manifestations of serious illness, it is inconceivable that Mr. Beaty did not know that he was not in "good health"; Dr. Ahn felt that Mr. Beaty knew he was quite ill at the time he applied for the in-

surance, and based this on the fact of the increasing distention of the abdomen, the gas pains, the increase of fluid in the abdominal cavity, which had to be drawn off, and the other symptoms accompanying the deterioration of Mr. Beaty's condition, and Dr. Ahn, in response to a question as to whether Mr. Beaty was aware he was not in "good health" stated:

"I believe he knew. I believe he knows —he knew because we took a large amount of fluid—he is getting worse."

Dr. Ahn, a specialist in pulmonary diseases, also testified to the effect that he had told Mr. Beaty "right where he stood"; Dr. Ahn was also further convinced that Mr. Beaty knew he was not in "good health" as he felt a layman could easily tell Mr. Beaty was quite sick just by looking at him.

In summary, it is our view that Mr. Beaty unquestionably was aware of so many facts positively indicating that he was not in "good health" at the time he signed the insurance application that it is patently inconceivable that he did not know that he was not in "good health" at said time. We conclude that this element, and all other elements of the misrepresentation defense, were established as a matter of law under the record in this case, and that appellants were entitled to an instructed verdict and judgment N.O.V.

The case of Industrial Life Ins. Co. v. First National Bank, Tex.Civ.App.1969, 449 S.W.2d 129, relied on by appellee, is not applicable to the case at bar, as the record in this case unequivocally contains the requisite and undisputed proof that the debtor or his beneficiary was duly supplied with a copy of the application containing the "good health" representation in question.

The judgment of the trial court is reversed and judgment is here rendered for appellants cancelling the insurance policy in question, with appellee recovering the $29.29 insurance premium which had been

restored and tendered to appellee. All costs are adjudged against appellee.

Reversed and rendered.

DAVIS, Justice.

I dissent. If appellee, Willis Beaty, thought that he was in good health at the time of the purchase of the car, and the appellant did not require him to be examined, the appellant is liable. The case should be affirmed; or, reversed and remanded for a new trial.